# JAMES E. CHANDLER, Respondent, v. S. H. HALE, Appellant.*

### Kansas City Court of Appeals. February 9, 1925.

1. **REFORMATION: In Determining Real Agreement Between Parties Contract as a Whole, Circumstances Under Which Entered into, Motives of Parties and Their Subsequent Conduct in Relation Thereto Must be Considered.** In an action on a contract where defendant sought reformation because of mistake of scrivener in failing to correctly express agreement of parties, in determining real agreement between parties, not only contract in its entirety but surrounding circumstances and conditions calling it into existence, must be carefully looked into, as well as motives actuating parties in entering into it and their subsequent conduct in relation thereto.

2. **————: Mistake Must be Mutual and Made Out by Clearest Evidence According to Understanding of Parties.** Courts of equity do not grant the high remedy of reformation upon a probability of error, but require that mutual mistake be made out by the clearest evidence, as every presumption is in favor of instrument as it is.

3. **APPEAL AND ERROR: Where Evidence Was Conflicting, Deference Should be Shown Finding of Chancellor Which is Entitled to Much Weight and Will Not be Disturbed on Appeal.** Where evidence was conflicting, decree for plaintiff upon contract sued on and dismissing defendant's cross-petition for reformation because of alleged mutual mistake in failing to correctly express agreement, will not be disturbed on appeal, the case being peculiarly one wherein the conclusion reached by chancellor is entitled to much weight since he heard witnesses, observed their demeanor and had better opportunity for determining truth of the matter.

---

*Corpus Juris-Cyc. References; Appeal and Error, 4 C. J., p. 898, n. 88; p. 900, n. 98. Reformation of Instruments, 34 Cyc., p. 904, n. 5; p. 915, n. 86; p. 979, n. 1; p. 980, n. 6, 7, 9; p. 984, n. 34; p. 988, n. 37.

Appeal from the Circuit Court of Jackson County. —*Hon. W. P. Hall,* Judge.

AFFIRMED.

*Guthrie & Conrad* for respondent.

*James M. Johnson* and *Donald W. Johnson* for appellant.

TRIMBLE, P. J.—This is a suit on a contract. Originally, the petition was in two counts, but the second count was dismissed at the close of the evidence, and no further notice need be taken of it.

Defendant's answer was coupled with a cross-petition for reformation, setting up that the parties signed the contract sued on, "mutually believing" that it expressed the agreement which in fact was intended to be and was made, but that by mistake of the scrivener called in to write the agreement, the contract as written did not correctly express said agreement. The contents of the answer will be stated hereinafter when the applicability of such contents will be more easily understood.

The record discloses that a jury was waived and the case was heard by the court, after which a decree was entered dismissing defendant's cross-petition, finding for plaintiff on his petition and rendering judgment for the amount asked. The defendant appealed.

The contract in issue grew out of the following situation and facts:

On March 3, 1920, the Commerce Trust Company held a note, amounting with interest, on that day, to $99,268.46, signed by plaintiff, by defendant and by John H. Atwood. This note had been given to obtain funds with which to purchase stock in an oil company of which defendant was president and Atwood was chief counsel. As between themselves, owing to the amount of stock each purchased, defendant owed one-half of said note, plaintiff owed one-fourth and Atwood owed one-fourth.

At the date above mentioned, defendant's financial condition was thought to be somewhat in doubt, and the Commerce Trust Company was wanting the note paid. From some source, not clearly disclosed by the record, a very large sum of money belonging to defendant came

to the Commerce Trust Company, being deposited therein to defendant's credit. The bank refused to allow defendant to check on this deposit, insisting on holding it to apply on said note.

Defendant had a deal on hand at that time which would require the use by him, of $40,000 in cash. He was desirous of making this deal, but could not obtain said amount from his deposit because of the bank's refusal to allow him to check thereon, unless the note above mentioned were paid. He, therefore, wanted to get said note out of the way so he could use the above sum out of his funds on deposit in the closing of the aforesaid deal.

Defendant, therefore, on the above-mentioned date, called plaintiff to his office for the purpose of making some arrangement whereby the note could be gotten out of the way. Defendant could pay his half of the note, to-wit, $49,634.23 and plaintiff was able and willing to pay his one-fourth, to-wit, $24,817.11, but Atwood was unable to pay one-fourth. A proposition was then made by defendant to plaintiff and agreed to by the latter, which, if satisfactory to Walter S. McLucas, President of the Commerce Trust Company, would result in getting the above-mentioned note out of the way and allow defendant to check on his deposit and put his contemplated deal through. After plaintiff and defendant had reached an agreement subject to McLucas's approval, the latter arrived, and the method by which the note was to be disposed of was stated to him, and he consented to it. This was that defendant would pay his one-half of the note in cash, plaintiff would pay his one-fourth thereof in cash and would also pay one-half of Atwood's one-fourth, and the other half of Atwood's part would be covered by defendant giving his note therefor to the Commerce Trust Company with plaintiff as endorser thereon. This method of disposing of the note hereinbefore mentioned being satisfactory to Mr. McLucas, defendant called from an adjoining room Mr. Stottle, a young man who was a licensed attorney employed as secretary and stenographer of various companies of which defendant was

president and who did defendant's work when requested.
The terms of the agreement between plaintiff and de-
fendant were then stated to Stottle for the purpose of
having him formulate them into a typewritten contract.
As the terms were stated to Stottle he made pencil notes
for his use in drawing said contract. In thus stating the
matter to Stottle, the defendant "did most of the talk-
ing," though plaintiff at times joined therein.

Stottle retired to his room and in about forty min-
utes returned with a contract written in duplicate on the
typewriter which he read aloud to the three men present,
McLucas, plaintiff and defendant; and the contract as
prepared by Stottle was assented to by plaintiff and de-
fendant as stating the terms of the agreement, at least
no objections were made to it, and McLucas compli-
mented the young man upon the very clear way in which
he had stated the terms of the contract in so short a
time, and the expression of his compliment was con-
curred in by plaintiff.

Thereupon plaintiff and defendant executed the con-
tract, each retaining his counterpart, and then the de-
fendant paid to the Commerce Trust Company his one-
half of the debt, or $49,634.23, plaintiff paid his one-
fourth, or $24,817.11 and also paid one-half of Atwood's
fourth, to-wit, $12,408.56; and defendant executed to the
bank his note for $12,408.56, the other half of Atwood's
part, and plaintiff endorsed the same. Thus, as defend-
ant says, they all thought they "had arrived at a very
happy conclusion."

The contract as written and signed is, in words and
figures, as follows:

"Contract."

"This agreement, made and entered into this 3rd
day of March, 1920, by and between S. H. Hale and
James E. Chandler, witnesseth:

"Whereas, the Commerce Trust Company holds
promissory note signed by J. H. Atwood, S. H. Hale,
and James E. Chandler, in the principal sum of $98,237.-
08, on which there is accrued interest due for January,
1920, of $507.47 and for February, 1920, of $474.80, and

for the first three days of March, 1920, of $49.12, making a total amount now due of $99,268.46; and,

"Whereas, said S. H. Hale owes one-half thereof, and said James E. Chandler owes one-fourth thereof, and J. H. Atwood owed one-fourth thereof; and,

"Whereas, the Commerce Trust Company requires payment of the said note, and said Atwood is not ready to pay his part of the same, and said Hale and Chandler are desirous of paying off the said note.

"That S. H. Hale is this day paying his one-half of said note and interest, to-wit, the sum of $49,634.23.

"That James E. Chandler is this day paying his one-fourth of said note and interest, to-wit, the sum of $24,817.12.

"That said Hale and Chandler are each paying one-half of the one-fourth of said note which should be paid by said Atwood, to-wit, said Chandler is paying the additional sum of $12,408.56, and said Hale is paying the additional sum of $12,408.56.

"It is understood that said Hale is obtaining said last-named sum of $12,408.56 by giving his note therefor to the Commerce Trust Company, due six months from the date hereof, bearing interest at six per cent per annum, and that said Chandler is indorsing said note, upon the understanding and agreement that said Hale shall at once, or as soon as he reasonably can, make demand upon Alfred Diescher, J. C. McDowell, and H. L. Doherty, for the payment of claims which said Hale has against Diescher, McDowell, and Doherty, amounting to $150,000, $150,000, and $100,000, respectively, and that if settlement of such claims is not made within ninety days from the date of such demands, said Hale will bring suit against said Diescher, McDowell, and Doherty, and if said Hale shall recover from such claims any sum over and above the expenses of such suits, he agrees to pay to said Chandler one-half of such amount, up to the amount of $12,408.56; it being understood that said Atwood is entitled to a portion of said Hale's claims against said Diescher, McDowell, and Doherty, and that this means is

adopted of reimbursing said Hale and Chandler for the payment of said Atwood's one-fourth of the note to Commerce Trust Company. If said Hale shall not recover from said Diescher, McDowell, or Doherty, as herein is set forth, he shall be under no obligation to reimburse said Chandler for the $12,408.56 paid by Chandler on Atwood's obligation.

"It is further understood and agreed that if said Atwood shall pay any part of his said one-fourth of said $98,237.08 note, at any time hereafter, the sum so paid shall be divided equally between said Hale and said Chandler.

"It is expressly understood and agreed that nothing herein contained shall be construed as waiving the right of said Chandler and Hale, or either of them from obtaining contribution from Atwood for the amount paid by them for him, at any time.

"In witness whereof, said S. H. Hale and James E. Chandler have hereunto set their hands this 3rd day of March, 1920.

"(Signed)    S. H. HALE,
"(Signed)    J. E. CHANDLER."

It will be observed that the contract, after setting forth the circumstances and the claims defendant had against certain parties, for which he would bring suit if settlement were not made, recites that "if said Hale shall recover *from such claims any sum* over and above the expenses of such suits, *he agrees to pay said Chandler one-half of such amount,* up to the amount of $12,408.56;" etc.

The controversy between the parties is over the *source* from whence Chandler was to receive from defendant anything under the contract. Plaintiff contends he was to receive from defendant a sum, up to $12,408.56, out of one-half of *any money* Hale obtained from Doherty et al., less expenses of suit; while defendant insists that Atwood had a *third interest* in the Doherty et al. claims, and that, under the agreement which he and plain-

tiff really made, Chandler was to be paid *only out of one half of Atwood's share* of such claims thus recovered.

It would seem to be defendant's theory, at least implied if not actually stated, that the only consideration or benefit inuring to Chandler, or which induced him to enter into the contract, aside from getting off the big note, was the mere opportunity of being reimbursed *out of one-half of Atwood's share* in said claims, and that the only consideration for defendant's promise to pay plaintiff up to $12,408.56 was the endorsement of defendant's note by plaintiff. We think it is important, however, to bear in mind that while Chandler could not hope to get more *in amount* than the sum he would pay on Atwood's debt, yet it cannot be said that conclusively he was *confined*, in that regard, to one-half of Atwood's share in the Doherty et al. claims; and that, notwithstanding Chandler was jointly liable on the entire note to the bank and would naturally want the note paid, yet it was *defendant* who, at this time, was especially desirous of getting rid of the note, and who was the moving spirit in the method adopted to get rid of it, so that he might use the rest of his money in his contemplated deal. Consequently, it cannot be said that the only consideration for defendant making the promise he did make was the obtention of plaintiff's endorsement on his note. Clearly, the petition does not confine the consideration for defendant's promise to the mere securing of plaintiff's endorsement. For all of the above reasons, it cannot be said that Chandler necessarily must have understood that defendant was agreeing to reimburse plaintiff, for the money he would pay on Atwood's debt, out of one-half of Atwood's share of the claims, and not that defendant was agreeing to reimburse plaintiff out of one-half of the money defendant would obtain on said claims.

The contract, as written, does not say that Chandler was to be reimbursed only out of one-half of Atwood's share. The only statement in the contract, *expressly* dealing with the *source* from which Chandler was to be

Chandler v. Hale.

reimbursed, is *directly to the contrary,* and it is Hale and not Atwood who agrees to pay plaintiff. The pleadings are based on the theory that the *written* contract is as plaintiff contends, for the petition pleads the written contract, setting out that it was made under the circumstances above outlined, and alleges that defendant promised to pay plaintiff up to $12,408.56, out of one-half of *any amount,* less expenses, which Hale obtained from Doherty et al.; while defendant's cross-petition concedes practically all of the facts except that it asserts the agreement really was to reimburse plaintiff out of one-half of Atwood's share, and that, through mistake, the contract as written did not express the true agreement, wherefore reformation of the written contract was asked. The answer sets up that defendant obtained in a settlement of the Doherty claims the net sum of $20,000 and that plaintiff had agreed to accept one-half of Atwood's one-third thereof in satisfaction of the liability.

At the time the contract was entered into, the claims Hale had against Doherty and two others amounted to about $400,000, and Hale thought he would obtain, either in settlement or by suit, a very large sum of money According to defendant's evidence, however, the other two men became insolvent, and Hale finally settled with Doherty for $22,500, of which defendant had to pay $2,500 to his New York lawyer, leaving $20,000 as the net amount obtained from the claims. And defendant, on the theory that Atwood was entitled to one-third of said $20,-000 and that his (defendant's) agreement with plaintiff was that the latter was to be reimbursed out of one-half of Atwood's share, admitted he owed plaintiff $3,333.33.

The cross-petition of defendant asking for a reformation of the written contract unquestionably converted the case into a suit in equity, requiring it to be tried and determined as such. That being the case, and the evidence being reviewable by us, giving to the findings of the Chancellor such deference as they may be entitled to, we will endeavor to set forth the evidence on the issue of reformation as compactly and clearly as possible.

Defendant, having the burden of proof on such issue, opened the case, and Mr McLucas was the first witness, his testimony being to the following effect:

That he remembered of having a conference with plaintiff and defendant, which, after refreshing his memory by recent discussion of the matter, he recalled took place in defendant's office; that Hale, Chandler and himself were present, he thought Stottle was there at least part of the time, but he did not remember, and "had no memory on that;" that he would not attempt to state the conversation, but only the general tenor of it; that he was there as a banker wanting the note paid, and had his mind more especially on that, and the parties had him there to give his approval to the method of paying it; that the method adopted was: Hale to pay half of it, Chandler to pay one-fourth and the payment of the other one-fourth was to be divided between Chandler and Hale, Chandler to pay in cash his one-half of said remaining one-fourth and Hale was to give his note to the bank with Chandler thereon, for the other half thereof; that the arrangement contemplated Mr. Atwood had an interest in some claim of Hale's against Doherty, or some of his companies, in some large amount, possibly around $100,-000; that Hale would proceed to collect the claim against Doherty, Chandler's attitude being that he should do so at once, and witness had "a vague memory" that Hale was to bring suit within ninety days, and "on that collection, if any, the proceeds applied to Mr. Atwood's share of it should go to liquidate the amount of this note which these two gentlemen paid for Mr. Atwood and (at) a ratio of fifty-fifty."

Witness was then asked if, in the conversation, the hope of the two men "was to reimburse themselves out of the share of the Doherty collection that would come to Mr. Atwood?" and he answered, "That is my memory of it." Witness gave the same answer when asked this question: "And when the proceeds of the Doherty claim was realized, the part coming to Mr. Atwood was to be divided 50-50 between Mr. Chandler and Mr. Hale

to reimburse them for what they had paid on Mr. Atwood's account?''

Witness further testified that he recently had had conversation with Chandler, perhaps three in all; that in those conversations he expressed himself to Mr. Chandler just as he had outlined it on the stand; that Chandler asked witness his memory of it, but it being a matter happening several years before, witness testified he, in the multiplicity of his bank matters, could not keep them all in his mind, and that perhaps some parts of his testimony had developed through a refreshing of his memory; that, however, the substance of his conversation with Chandler was that he told him witness's recollection of the conversation in Hale's office, that what he (witness) told him, Chandler, was the same as he had stated on the stand.

Witness did not remember whether he remained in Hale's office until after the agreement was put in writing or not; he remembered that on some occasion he complimented Stottle in some connection but whether it was then or not he did not remember. If that was the time, he did stay and did hear the writing read but he had no memory on it.

Witness further testified that Chandler in said conversations with him said he did not know what Atwood's share was, that all he (Chandler) knew about that was what he had been told recently, namely, a third; that Chandler did not say in those conversations he was entitled to one-half of Atwood's third but that Hale had proposed to pay him half of it, but he would not accept it and was standing on the written contract; that it was not his, witness's, understanding that there was any difference between Chandler's and witness's understanding of what the agreement was. And yet the witness went on to testify that Chandler said he relied on the contract and that the contract stated what the agreement was, and showed witness the contract, which the latter glanced at, but witness did not remember whether the contract was inconsistent with the statement witness

had made or not, and he, witness, did not know whether it was inconsistent with his statement or not, but that he remembered Chandler told him Hale had proposed to pay him $1500, but that if the amount realized on the Doherty claim was $20,000 as Hale claimed, he, Chandler, would be entitled even on Hale's own figures to $3,333.33, but that he did not agree to accept that.

On cross-examination, witness said he was at the conference of the two parties as a banker interested in getting his note paid, and so long as he got that done, he had no particular interest in the matter, and, when an arrangement was made whereby three-fourths of the note and one-half of the other fourth was paid in cash and the other half thereof covered by a note signed by both Hale and Chandler, that ended his interest in the matter. Witness did not definitely remember whether Stottle brought in the contract he had written up and read it or not, but he must have done so if his compliment of Stottle took place on that occasion. Witness did not remember how they paid the note, but it was paid. He was then asked, "Q. Have you any recollection of Mr. Chandler's ever saying at any time during this conference that you refer us to, in March, 1920, that he was willing to accept one-half of whatever Mr. Hale thought fit to give Mr. Atwood out of the proceeds of the Diescher, McDowell and Doherty claims?" And his answer was, "A. My statement on that, my memory on that was that *that was the arrangement.* Now that is the distinct memory in my mind that that was the arrangement. As to his stating that *I cannot remember any direct statement about it.*"

Witness readily stated, when asked about it, that his idea of what occurred there was in large part due to the impression he had when he went to Hale's office, or received after he arrived there, that Atwood had some sort of an interest and was to get some money out of it in some way, and witness got the impression that as long as these two gentlemen were paying Atwood's part of

the note, they were going to divide the money between them.

Hale was the next witness and he testified that when he was notified by the bank his deposit was going to be held for the note, he got in touch with Chandler and together they worked out the plan by which it was paid off; that they came to an agreement before McLucas arrived; that he told Chandler Atwood had a third interest in the claim against Doherty et al. and they could reimburse themselves out of Atwood's share for the amount they paid on Atwood's debt; that he told Chandler he thought Atwood's share would furnish ample funds to reimburse them both. Witness could not repeat the conversation word for word but "it was along this line," the substance of it was that they were to reimburse themselves out of Atwood's share, up to $12,408.56 each.

Defendant further testified that when McLucas came in they told him what had been talked over about paying the note and McLucas agreed to the plan, and that they told McLucas what they had agreed upon between themselves; that he, defendant, told McLucas in this conference that he was to pay Atwood one-third of whatever he got out of the Doherty et al. claims and this "was to be divided between us 50-50 up to the amount we paid out for Mr. Atwood;" that nothing whatever was said about what compensation was to be paid by defendant to Chandler for endorsing his note for one-eighth of the amount; that finally Stottle was called in and they told him the terms of the agreement—i.e., Hale was to pay his half of the Commerce Trust Company note, Chandler his one-fourth and also half of Atwood's one-fourth, and Hale would give his note to the bank to pay the other half of Atwood's one-fourth, Chandler endorsing the note; and that he, Hale, would push the claims against Doherty et al. and endeavor to get a settlement in 90 days and if not successful, he would bring suit, and that in case of a compromise or judgment therein "Mr. Chandler and myself would reimburse ourselves out of the money that was coming to Atwood—his compensation" in the pro-

portion of "50-50 until we were reimbursed out of At-
wood's portion;" that after Stottle brought the type-
written contract in "we read it over," witness could not
say who read it whether McLucas, Chandler or he did it
but it was read by one of them, that McLucas compli-
mented Stottle on stating the contract so clearly, and
Chandler said, "I think so too;" that witness did not
understand that the contract as written provided he
should pay Chandler one-half of what he received, but
he understood he should pay Chandler one-half of At-
wood's part, they reimbursing themselves out of At-
wood's part, each taking $12,408.56 and that that was
the verbal agreement between them. Defendant further
testified to finally settling with Doherty for $22,500 of
which amount he paid $2,500 to his New York lawyer,
leaving $20,000 as the net amount he got out of the claim;
that about the first of March, 1923 (he received the $20,-
000 from Doherty about January 3, 1923), Chandler
came to his office and said he had learned that defendant
had settled with Doherty; that he told Chandler he had,
and that, taking into consideration everything he had to
release or forego, he would receive only in the neighbor-
hood of $9000, Atwood's one-third of which would be
$3000 and half of that would be $1500, which he offered
to pay Chandler; that Chandler protested, but only a-
bout taking into consideration other expenses outside of
the New York lawyer's fee, and that then Chandler left
saying he had not had time to figure out what should be
coming to him.

Defendant further testified that in a few days
Chandler returned and defendant said to him, "Jim, I
think I will pay you about $2,500; I think that will be all
right. After taking out my expenses in this thing, I be-
lieve you should have $2,500;" that Chandler would not
agree to it; that about the first of April Chandler came
back again and said to defendant, "according to your
own figures, Atwood is entitled to $6,666.66, one-third of
$20,000—if you will give me one-half of $6,666.66, or
$3,333.33, I will be satisfied;" that defendant told him

219 Mo. App.—10.

that would be just giving him "$1800 more than I feel like you ought to have;" "that Chandler replied that he thought he was entitled to $3,333.33, and that he would come back in a day or two for defendant's answer, and left.

Some correspondence between Hale and Chandler was here admitted in evidence from which it appears that on April 30, 1923, defendant wrote Chandler, saying, "Since l last talked with you relative to the Doherty matter, and knowing that you feel as you do about the same, I have decided that if this is satisfactory to you, I am willing to give you $3,333 which is the amount that you suggested, as a full settlement of your part under the contract."

To this Chandler replied on May 3, 1923, saying, "You are in error with respect to my having suggested to you that I would accept $3,333 in settlement of my claim under our contract of March 3, 1920. The only connection in which the amount $3,333 was mentioned was this: You offered me $1500 and I replied that upon your own figures it should be as much as $3,333." Chandler's letter then went on to say that he would not accept such sum, as he had no reason to do so under the contract; that as Hale had settled with Doherty without consulting him, Hale ought to pay him the entire $12,-408,56, but inasmuch as he, Hale, was saying he realized only $20,000 out of the Doherty claim, he, Chandler, would accept one-half thereof in settlement of the matter, otherwise he would place the matter in the hands of his counsel.

To this Hale replied in a long letter of May 12, 1923, expressing his great surprise at receiving such a letter; that he had explained to him, Chandler, that after deducting his expenses connected with the claim, he did not owe Chandler over $1500, but that rather than have any trouble or expense, he was willing to pay the $3,333 suggested by Chandler, which was far more than he should be compelled to pay "but as a matter of compro-

mise I am willing to pay you the $3,333 on December 23, 1923, and no more.''

Apparently, Chandler placed the matter in the hands of his counsel, for the next letter was from that source, dated May 14, 1923, making formal demand for a statement of the expenses incurred in obtaining a settlement of the Doherty claim. To this defendant replied on May 16, 1923, enclosing copy of a release he had to give to Doherty to get the $22,500 and out of which he had to pay the $2,500 to his New York lawyer, and stating that ''about $11,000 went to cover expenses and other claims released, leaving about $9,000 for me and Mr. Atwood;'' that if the writer allowed Atwood one-third of this it would be $3,000 and under the contract with Chandler and himself the former would be entitled to $1500, which he had offered him, but owing to Chandler's claim that he thought he ought to have, and would take, one-half of one-third of $20,000, he had decided to give him that amount for the reasons set out in his letter to Chandler of a certain date. The writer went on to state further that ''the amount which Mr. Chandler should receive, based on allowance of one-third to Mr. Atwood of the net amount received, would be approximately $1500. *There never was any contract or agreement between myself and Mr. Atwood as to what he should receive out of the Doherty claim* and it was out of the goodness of my heart that I was willing to allow him one-third.''

In cross-examination, defendant admitted writing this letter, and also admitted that Atwood was a witness in the matter of the claim against Doherty and therefore could not act as attorney, but stated that Atwood had sat in the conference out of which the Doherty claim grew, and while he, Hale, had no definite contract with Atwood, as to what he should receive, Hale had told him he ''would take care of him.''

In further cross-examination defendant testified that the $11,000 he had claimed to Chandler should be deducted from the $20,000, was made up of claims of certain companies, notably a gas company Hale was in-

terested in, and that in order to get a settlement of his individual claim against Doherty he had to have these companies forego or give up their claims. But he could give no itemized statement of these matters, and said he did not know the amount thereof in dollars and cents as he was not now making any claim of deduction for them. He testified that the companies were not required by Doherty to give release to him, but that he required and obtained a release from Doherty, which was introduced in evidence, but it merely covered in a general way all claims against Doherty held by Hale individually or as a surviving partner of H. L. Doherty & Co.

Defendant, on cross-examination, further admitted that he received the $20,000 from Doherty on January 3, 1923, and on that day he wrote Chandler he had that day paid off the note Chandler was on as endorser for him, thanking him for going on the note, and saying he was glad he could look every man in Kansas City in the eye and say, "I don't owe you a——cent." The letter, however, made no mention of the fact that he had settled with Doherty or had received any money from him. (There is some evidence tending to show that Hale knew as far back as December 20, 1922, the amount he could get out of Doherty.)

Stottle, testifying as a witness for defendant, said that he was called in to formulate the contract, the terms of which were given to him, he taking pencil notes of the same; that Hale did most of the talking, he could not say definitely whether Chandler said anything, but he might have; they all participated in the conversation but he didn't remember what each one said; that he intended to write the contract so as to express what they told him they had agreed upon, "that they each were to get one-half of whatever was recovered belonging to Mr. Atwood. They would equally divide Mr. Atwood's part." He further testified, "*I don't remember that anything was said about the amount* (of Atwood's interest). All I remember is it was mentioned that he had an interest;" that he knew at the time Atwood had some inter-

est, a third, a fourth, of what might be recovered; that
such interest was for attorney's fees "or something like
that." He didn't know what it was as it arose before
witness became connected with Hale's companies.

Witness further testified that when he returned to
the room with the contract he read it over to them; that
no comment was made except the McLucas compliment;
that the money on the Doherty claim was received on
January 3, 1923. Witness was not able to recall what
Chandler said to Hale in his interviews subsequent to
his discovery that Doherty had settled, and therefore did
not corroborate Hale as to that.

On cross-examination, Stottle said they told him At-
wood had an interest in the claims, but he didn't remem-
ber that they told him the amount, nor did he ask the a-
mount thereof. He admitted that in a deposition he had
said, when asked to give the terms of the agreement as
given him by Mr. Hale as near as he could in the latter's
language, "I could not state it any better than what it
stated in the contract. My recollection would not go
any better than that." Also, that in said deposition, he
was asked that since Atwood's interest was being dis-
posed of by agreement between the parties, did he not as
a lawyer recognize the fact that it was very important
to know the amount of such interest, and his answer was,
"I did not see that it entered into it particularly, as Mr.
Hale did not have to go beyond a fixed amount;" and he
testified that he understood the contract to be that if
Hale recovered anything he would be liable to Chandler
for half of Atwood's part, but it didn't occur to him
that it was necessary to put it into the contract.

At this point the court asked the witness if Mr. Hale
told him of the agreement he had with Atwood that he
was to give him a fixed certain interest in the claims, and
the witness said, "He didn't agree to give a certain
fixed interest" and that "when I went in there I didn't
know the question was going to come up and I didn't
have the least knowledge of what kind of a contract was
to be drawn. When I got the information I knew Mr.

Hale was going to give Mr. Chandler a share of whatever he recovered from the claims *but it was not mentioned that Mr. Atwood's interest should be put into the contract.*

Hulsey, a witness for defendant, who had an office adjoining defendant's, testified that he was in his office with an open door between them when Chandler came in and had an interview with Hale about settlement; that from his office he heard them talking of a settlement of a contract and an offer of $1500, and that he heard Chandler say, after calling for the contract and reading it over, "According to this contract, I am entitled to $3,333. You think it over and see if I am not right and let me know." This was about the extent of what he remembered of the conversation, except that Hale said he would give Chandler $1500, to which Chandler replied, "No, I am entitled to $3,333" and Hale said, "Jim, I will be paying you $1500 out of my own pocket."

Chandler testified that probably a day or so prior to March 3, 1920, Hale told him the bank had his, Hale's money tied up, which witness thought, from what Hale said, amounted to somewhere between $75,000 and $90,-000, and that he, Hale, had an important deal on hand, and wanted to get the note paid so his deposit could be released; that afterwards Hale called witness into his office and told him Atwood could not pay his part, and Hale said he had some claims Atwood was interested in and said to witness, "I will enter into a contract with you whereby you will not lose anything. I am satisfied of that on account of the amount of our claims;" that witness asked Hale how Atwood entered into it, and what chance he, Chandler, had in case Hale's claims were not good, and Hale told him not to worry about that, witness would get all of his, witness's money; that Hale said Atwood would have to be a witness and could not act as attorney, to which Chandler replied that that part of it was immaterial to him.

Chandler further testified that Hale did not at any time say what Atwood's interest in the claims was, nor

did he tell him the nature of it nor that it was for attorney's fee, that Hale did not say a word about the extent of Atwood's interest; that Atwood was not present at any of the conferences; that Hale just casually said, "Atwood is interested in the claims" and witness was not interested in that as he was relying on Hale to reimburse him and he said to Hale, "This is fine because if you don't get anything out of these claims why we lose but whatever we get, we get 50-50 up to $12,400;" that they never talked about getting any money out of Atwood; his confidence was the assurance of Hale, because Hale was absolutely liable for a sufficient amount to take care of it.

Witness testified that in the conference after McLucas arrived nothing was said about Atwood's interest or the extent thereof; that he did not know what Atwood's interest was; that the proposition made to him by Hale was not limited to Atwood's part, but it was "half of the amount recovered up to $12,400" that Hale would pay to plaintiff; that Hale had proposed to him that "if you will pay your one-fourth and will pay one-half of Atwood's one-fourth, and endorse my note for $12,400 so I can pay the other half of Atwood's one-fourth, I will make a contract with you whereby you will get all of this money back up to $12,400 in this contract. Unless the claims are settled within ninety days I will bring suit and will arrange and fix it so you will have a half of what I get up to $12,400;" that the first he ever heard that he was to be paid out of Atwood's part was when, having heard that the claim against Doherty had been settled he went to Hale about it; that in telling the terms to Stottle nothing was said to him about his being reimbursed out of Atwood's share, nor was there anything of the kind said when McLucas's approval was obtained; that the contract and agreement was that if Hale recovered on the claims, plaintiff was to get half of it up to $12,400 but if Hale recovered nothing he was not to get anything.

Chandler further testified that in the interviews with Hale subsequent to the settlement made with Doherty he insisted on his being entitled to one-half of what Hale got up to $12,408.56 and that what he said about $3,333,-33 was that, according to Hale's own figures, it would be that much.

The contract as a whole, if *alone* considered, without regard to any of the circumstances and situation of the parties out of which it grew, would seem to at least give rise to a strong impression that possibly plaintiff's reimbursement was intended to be made out of Atwood's share, and yet, as heretofore stated, what the contract expressly says on that subject, is not that way. And, as heretofore remarked, the pleadings are drawn on a theory which conceded this. But even if they did not, we do not know how it could be said that the written contract itself shows that Atwood's share of the Doherty claim was to be the source, or the sole course, of plaintiff's reimbursement. Therefore, upon an issue of what was the real agreement between the parties, not only the contract in its entirety but also the surrounding circumstances and conditions calling it into existence, must be carefully looked into, as well as the motives actuating the two parties in entering into it and their subsequent conduct in relation thereto.

It would seem that McLucas was the only disinterested witness at the conference when the terms of the contract were finally gone over, approved and formulated. And his testimony in chief tends to support defendant's contention; but he frankly concedes that he was interested only in getting his note paid and was not concentrating his mind on the source from whence Chandler was to be reimbursed; and he says, on cross-examination, that he is not cerain whether his view of the matter is not merely an *impression* born of the knowledge that Atwood was not paying his part and had an interest in the Doherty claim, and that consequently both of the two men paying his part would naturally reimburse themselves out of his share. Again, McLucas shows by his

testimony that his memory is not clear as to what took place and he frankly says so.

One thing is certain, if the sole source of Chandler's reimbursement was to be one-half of Atwood's share, then the proportion or extent of his share was a very important matter which would vitally enter into the contract and vitally affect Chandler's rights under the contract; and yet it is clear from McLucas's testimony, and that of Stottle as well as that of plaintiff, that the nature or extent of Atwood's interest was not mentioned, and the contract as written does not mention it; and Stottle says he did not consider it important to put it in nor was he told to do so. It is not in accordance with the usual and ordinary way of doing things for a man to enter into a contract with one man to pay $12,000 for another and obligate himself as security for an additional $12,000 to be reimbursed out of one-half of the other man's share in certain claims, without even knowing or having it carefully stated in the contract what that share was. On the other hand it would be perfectly natural for him to have no concern about what the third man's share was, if the agreement was that the man he was dealing with was to reimburse him, and the contract, as drawn, with no mention of the extent of the third man's share, is likewise in keeping with that situation.

Again, it is beyond dispute that defendant was the *moving spirit* in the matter and most vitally concerned in effecting the arrangement whereby the Commerce Trust Company's note could be disposed of, and it is furthermore unquestioned that he was confident he could realize a very large sum of money out of his claims, at least $100,000 out of $400,000, and hence it would not be unnatural for him, in his earnest desire to get rid of the bank's annoying note, to agree to, *himself*, reimburse plaintiff for paying half of Atwood's debt, thinking that, as between himself and Atwood, he could easily repay himself for the whole of Atwood's debt, out of Atwood's share of the claims.

Furthermore, a contract limiting Chandler's reimbursement to one-half of Atwood's share in the amount recovered on the claims necessarily would imply that Atwood had a fixed, definite, interest therein; and defendant, in his contentions as to what the contract really was, proceeds upon the theory that Atwood's interest was a *third,* and was for an attorney's fee, yet in his evidence he concedes that Atwood had no definite, fixed interest therein, and admitted that he wrote, in the letter of May 16, 1923, that "there never was any contract or agreement between myself and Mr. Atwood as to what he should receive out of the Doherty claim and it was out of the goodness of my heart that I was willing to allow him one-third;" and nowhere in the evidence is there any proof that Atwood had an attorney fee therein. He was a witness to the transactions on which the claims were based and could not act as an attorney in the collection or settlement of them.    There is nothing in the evidence to show the basis of Atwood's share in the claims, except possibly defendant's statement that Atwood was present and sat in the conference at which the transactions giving rise to the claims occurred. Again, it may be inquired whether it would be natural for Hale to tell Chandler Atwood had a third interest therein and to specify, as one of the terms of the contract, that Chandler's reimbursement was to be out of one-half of that third, when as a matter of fact Atwood did not have any definite interest in the claims but only whatever Hale chose out of the goodness of his heart to give him? Such would likewise be naturally in keeping with the fact that the extent of Atwood's interest was not mentioned to Chandler nor in the conference at which McLucas and Stottle were present, and also with the fact that it was no deemed to be of sufficient materiality to be stated in the contract.

Furthermore, the conduct of the parties subsequent to the contract is sufficient to claim the attention of the chancellor who tried the case.

There is room in the evidence for an inference that as early as December 20, 1920, Hale knew he could get $22,500 in settlement of the claims, but at any rate he received $20,000 net on January 3, 1923, and wrote Chandler that he had paid off the note which Chandler had endorsed, but said nothing about having settled with Doherty or of what he owed Chandler on the contract, though saying he could look every Kansas Cityan in the eye and tell him he didn't owe him a cent.

When Chandler finally learned from Atwood of the settlement, and spoke to Hale about it, the latter claimed to have received only $9,000 net and offered $1500 as half of Atwood's third. Then when Chandler came to see Hale about it again, the latter raised his offer to $2500. Hale says that Chandler then agreed to take $3,333.33, but Chandler says he merely observed that on Hale's own figures he would be entitled to that amount. Afterward Hale wrote Chandler April 30, 1923, that he had decided, "if this is satisfactory to you," to pay $3,333, adding that this was the amount Chandler had suggested he would take in full settlement. If such was Chandler's statement, it is not quite clear why the expression "if this is satisfactory to you" would be used. Hale's interpretation of Chandler's course at first, in leaving without insisting upon any definite amount as due him, seems to be that it was because Chandler was not sure in his own mind, what the contract was; but Chandler's explanation is that he at that time had no means of knowing what the expenses were which Hale wanted to deduct. The evidence discloses nothing but the $2500 fee paid to the New York lawyer that could be deducted; and though in Hale's letter of May 12, 1923, to Chandler, he claims that "expenses incurred in the matter" reduced the net amount obtained from Doherty to $9,000, yet no effort was made to show any such expenses, nor was evidence thereof produced in answer to plaintiff's subpoena *duces tecum* calling on defendant to produce it.

With the evidence in this shape, are we in a position to say that the chancellor who tried the case and

saw the witnesses, erred in the conclusion he reached on the question of reformation of the contract? The question of whether the contract should be reformed is the controlling question herein, for if that is not done, the written contract and the conceded evidence as to the net amount received from Doherty determines the plaintiff's right to the judgment he obtained. It is well settled that courts of equity "do not grant the high remedy of reformation upon a probability of the error." [Sweet v. Owens, 109 Mo. 1, l. c. 7.] The contract, in the only place where it expressly says who is to reimburse plaintiff and the source thereof, says it is defendant who agrees to do so and that he will pay same out of the sums recovered by him on the claims. "Every presumption is in favor of the instrument as it is and the evidence must be unequivocal to show both that an error was committed and also its precise character." [State ex rel. v. Franks, Admr., 51 Mo. 98, 99.] The agreement and the mistake must be made out by the clearest evidence and according to the understanding of both parties. [Tesson v. Atlantic, etc., Ins. Co., 40 Mo. 33, 36.] Of course, the mistake must be mutual; and while, if Stottle made a mistake, it would be mutual if, as he says he was, he were acting for both parties. [Meek v. Hurst, 223 Mo. 688, 696; Robinson v. Korns, 250 Mo. 663, 675.] But the evidence is that he was Hale's employee, called in to draft the contract on the terms given to him, and though the evidence is conflicting as to the source from whence the plaintiff was to get reimbursement, yet there are so many things connected with and surrounding the matters that transpired in the conference room and the situation out of which the contract grew, that we think the case is peculiarly one wherein the conclusion reached by the Chancellor is entitled to much weight since he heard the witnesses, observed their demeanor while testifying, and had better opportunities for determining the truth of the matter than we. It is well settled that some deference should be paid the chancellor's findings on that account. [McFarland v. Bishop, 282 Mo. 534, 547-8;

Williams v. Hybskmann, 247 S. W. 203, 206; Bourg v. Mfgrs. Ry. Co., 245 S. W. 43, 44.]

We are of the opinion that the judgment should be affirmed, and it is so ordered. All concur.